569 So.2d 1098 (1990)
Willie MALONE and Mary Malone, Individually and as Husband and Wife, Plaintiffs-Appellees,
v.
STATE of Louisiana, DEPARTMENT OF HEALTH & HUMAN RESOURCES, OFFICE OF HOSPITALS, et al., Defendants-Appellants.
No. 89-499.
Court of Appeal of Louisiana, Third Circuit.
November 7, 1990.
*1099 McHale, Bufkin & Dees, Louis D. Bufkin, Lake Charles, for plaintiffs-appellees.
Stockwell, Sievert, Viccellio, Clements & Shaddock, Robert W. Clements and Wm. B. Monk, Lake Charles, for defendants-appellants.
Raggio, Cappel, Chozen & Berhiard, Lee Gallaspy, Lake Charles, for defendant-appellee.
Before DOMENGEAUX, C.J., and STOKER and YELVERTON, JJ.
STOKER, Judge.
This is a medical malpractice suit brought by plaintiff, Willie Malone, against the State, Department of Health & Human Resources, Office of Hospitals (DHHR) and one of its employees, Dr. Ronald E. Jamerson, to recover damages for loss of Malone's right leg by amputation. Plaintiff's wife, Mary Anne Malone, also filed a claim for loss of consortium. Other defendants were originally joined but were dismissed by plaintiff at the opening of trial. An intervention was filed by United Stated Fidelity & Guaranty Co. (USF & G) to recover amounts paid in worker's compensation and medical benefits on behalf of International Maintenance Corp. (IMC), Malone's employer.
The trial court held in favor of plaintiffs. Willie Malone was awarded $2750.41 for past medical expenses, $4042.50 for the initial cost of a prosthesis, $200 per year for 21 years for maintenance of the prosthesis (future medical expenses), and $300,000 in general damages. Mary Anne Malone was awarded $21,000 for loss of consortium. The trial court did not award damages for loss of future wages because plaintiff failed to show a wage-earning capacity and dismissed the intervention.
The DHHR and Dr. Jamerson suspensively appeal the judgment contending the trial court erred in concluding that the plaintiffs carried their burden of proving that Dr. Jamerson committed malpractice which resulted in the amputation of Malone's leg and that the trial court awarded an excessive amount in general damages to Malone. Plaintiffs answered the appeal asking for an increase in damages, but abandoned the issue in their brief. USF & G has not appealed the dismissal of its intervention.

FACTS
Willie Malone sustained a back injury on March 28, 1984 while employed by IMC, which was insured by USF & G. Malone received worker's compensation benefits and his condition did not greatly improve. On the evening of August 26, 1986, his left leg gave way at home, and he fell to the ground on his right knee. Malone's right knee began to hurt. Fearing it was broken, he went to the emergency room at Moss Regional Hospital, a state institution in Lake Charles, in the early morning hours of August 27, 1986. Dr. Fontenot examined Malone and had the knee x-rayed. Dr. Fontenot diagnosed a contusion of the knee, finding slight swelling in the soft tissue about the knee but no puncture, bone injury or foreign object. He prescribed an anti-inflammatory agent and instructed Malone to use ice and heat and to elevate the knee.
Malone's knee continued to swell and be painful, so he again reported to the Moss Hospital emergency room. He was attended at 12:10 p.m. on August 30, 1986 by Dr. Jamerson. The knee was again examined and x-rayed. Dr. Jamerson diagnosed prepatellar bursitis and suspected an early, mild infection. He found no puncture, foreign object or fluid but noted that the knee was hot and markedly swollen. Malone had a low grade fever, a mildly elevated white blood count and an elevated blood sugar level. Dr. Jamerson determined from Malone what medications had previously been prescribed for him, but he did not check Malone's hospital record for the August 27 visit.
*1100 Dr. Jamerson administered a tetanus shot (since Malone told him he had scraped his knee on a nail), changed the anti-inflammatory and painkiller prescriptions and further prescribed a broad spectrum antibiotic. He instructed Malone to use warm compresses and to keep his leg elevated. He made an appointment for Malone to return for a follow-up visit in ten days.
On September 4, 1986, Malone visited his orthopedist, Dr. Bernauer. Dr. Bernauer observed that Malone's knee was reddened, swollen and had a smelly, purulent discharge which caused the skin to blister. He advised Malone to go immediately to the Moss Hospital emergency room. Malone did so and was diagnosed as having gas gangrene in his right knee. His right leg was then amputated in order to save his life. Expert testimony showed that Malone would have been dead by the time of the ten-day follow-up visit.

OPINION

MALPRACTICE CLAIM
Defendants contend on appeal that the trial court erred in finding that Dr. Jamerson committed malpractice which necessitated the amputation of Malone's right leg.
Dr. Jamerson was a resident at Moss Regional Hospital in August 1986. He was doing emergency room work as part of his surgical training on August 30, 1986. His obligation was to exercise the degree of skill ordinarily employed by physicians practicing in similar localities and under similar circumstances, and to use reasonable care along with his best judgment in exercising that skill. If he failed in either respect and if his substandard care resulted in plaintiff's injuries, the doctor is deemed negligent and his employer is vicariously liable for his breach of this professional duty. LSA-R.S. 9:2794; Smith v. State, through DHHR, 523 So.2d 815 (La. 1988); Allen v. State, 535 So.2d 903 (La. App.2d Cir.), writ denied, 536 So.2d 1201 (La.1988). A medical diagnosis is an act of professional judgment which cannot be made with absolute precision and which should not be evaluated solely by hindsight. Courts determine whether a doctor's conduct is reasonable under the circumstances with which the doctor is faced when his professional judgment is exercised. Allen v. State, supra; Tillman v. Lawson, 417 So.2d 111 (La.App.3d Cir. 1982).
The trial court held that Dr. Jamerson committed malpractice in not ordering a short-term follow-up visit to insure that the prescribed antibiotic was effective against the infection in Malone's knee since the type of infection was unknown. Expert testimony established that, since the early signs of infection were present, a follow-up visit the next day would have been proper.
The trial court did not abuse its discretion in giving greater weight to the opinion testimony of Dr. Bernauer, Dr. McCulloch and Dr. Gentry that there should have been a follow-up visit in one or two days rather than in ten days. See Lirette v. State Farm, 563 So.2d 850 (La.1990); Allen v. State, supra.
In addition to finding negligence in not ordering a short-term follow-up, the trial court found that Malone should have been instructed upon discharge to return if his condition worsened. Expert testimony established that this is a standard emergency room practice. Malone alleged that he had not been told to do so. Dr. Jamerson and Nurse Lanson, Malone's discharge nurse on August 30, testified that they did so instruct Malone despite the fact that they failed to document the instruction in Malone's hospital record. The trial court did not clearly abuse its discretion in rejecting their testimony since they failed to record the instruction with the other instructions given to Malone.
The defendants argue that the trial judge misinterpreted the action of Dr. Jamerson in noting that Malone should return in ten days but failed to indicate that he advised Malone to return before that if his condition worsened. The defendants' argument on this point is that such instructions are not mutually exclusive. Rather, the reason for the instruction to return in ten days was for the purpose of having administrative *1101 personnel set up the appointment. Thus, according to defendants, Dr. Jamerson could consistently give both instructions. Defendants argue that, for this reason, there was no need to note on Malone's record that he was told to return if his condition worsened. Consequently, the mere absence of a notation to return if the conditioned worsened is not indicative of a failure by Dr. Jamerson to give such instruction. For these reasons, the defendants argue that the trial judge erred in relying on the absence of such an instruction in making a credibility evaluation.
In our view the argument of defendants oversimplifies the matter. It is true that the trial judge made a credibility evaluation, but the reasons for judgment as a whole show that the trial judge expressed a broader reason than mere credibility. The trial judge's reasons indicate that he concluded that Malone's condition was such that it should not have been left up to Malone to judge whether it was necessary or advisable to return to see Dr. Jamerson. On the contrary, the trial judge made it clear that Dr. Jamerson should have ordered a short-term follow up, and he should not have relied on the wide-range antibiotic he prescribed.
After careful review of the record, we do not find the trial court erred in holding Dr. Jamerson guilty of malpractice. There was much conflicting and contradictory testimony at trial as to the symptoms displayed by Malone on August 30 and the propriety of Dr. Jamerson's diagnosis and treatment. Defendants correctly pointed out that it is inappropriate to use hindsight in determining whether a physician has committed malpractice. However, the record supports the trial court's conclusions that it was malpractice for Dr. Jamerson not to order a short-term follow-up visit in order to determine the efficacy of the prescribed antibiotic in combating the unknown infection and in not instructing Malone to return to the emergency room if his condition worsened.
We also agree with the trial court's conclusion that the malpractice caused the necessity for Malone's amputation. Expert testimony established that gas gangrene can be treated by methods other than amputation, at least in the early stages. Had the inappropriateness of the prescribed antibiotic been discovered earlier and the type of infection present then determined, the leg could have been treated by means other than amputation. We find that there was sufficient evidence of causation to support the trial court's judgment.

EXCESSIVE DAMAGES
Defendants contend on appeal that an award of $300,000 general damages for Malone's pain and suffering is excessive. We affirm the award.
Before a court of appeal can disturb an award made by a trial court, the record must clearly reveal that the trier of fact abused its discretion in making its award. The use of a hypothetical scale of prior awards, made for merely generically similar injuries, cannot be used to determine whether or not the trier of fact abused its discretion in making the award. The initial inquiry of the reviewing court must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is a clear abuse of the trier of fact's much discretion. The prior awards may serve as an aid in this initial determination where the present award is shown to be greatly disproportionate to the mass of past awards. Reck v. Stevens, 373 So.2d 498 (La.1979); Allen v. State, supra.
Malone testified that on August 30 his knee was swollen to a size between one and one-half and twice the normal size, was painful and was hot. On September 4, it was open and draining a fluid which blistered his skin and smelled bad. After the amputation Malone continued to feel pain and itching where his right leg used to be as if it was still there. Malone returned to the hospital in October for a skin graft.
The amputation aggravated Malone's preexisting back problem. Expert testimony by Dr. Litel, a neurosurgeon, and Dr. England, a chiropractor, established that Malone is suffering much worse back pain since the amputation than before because he now stands on one leg and two crutches. Malone has not acquired a prosthesis due to the cost.
*1102 Malone has a fourth grade education and is illiterate. He did construction work until he injured his back at work in 1984. Expert testimony established that Malone could have eventually returned to work without bending or lifting had he not lost his leg. The only types of work available to him now will require training.
Prior to the amputation, Malone fished, cooked, assisted his wife with the housework and helped care for the four children, one of whom is handicapped. Since the amputation Malone has been unable to do these things and requires his wife's assistance with many personal care tasks such as dressing.
After consideration of the particular facts of this case and the mass of recent prior awards for generically similar injuries,[1] we hold that the trial court did not abuse its great discretion in awarding $300,000 general damages.

CONCLUSION
For the reasons given, the judgment of the trial court is affirmed. Costs of this appeal are assessed to defendants-appellants.
AFFIRMED.
NOTES
[1] General damages awards considered were: Byrd v. Bossier Parish School Bd., 543 So.2d 35 (La.App.2d Cir.), writ denied, 550 So.2d 628 (La. 1989) ($325,000 for loss of leg); Allen v. State, 535 So.2d 903 (La.App.2d Cir.), writ denied, 536 So.2d 1201 (La.1988) ($225,000 for loss of leg); Elliot v. Eaves, 476 So.2d 388 (La.App.2d Cir.), writ denied, 478 So.2d 908 (La.1985) ($115,000 for loss of leg).